IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| PAUL A. LEWIS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | 1:15CV588 |
| ) | |
| CAROLYN W. COLVIN, ) | |
| Acting Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

MEMORANDUM OPINION AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE

Plaintiff Paul A. Lewis ("Plaintiff") brought this action pursuant to Section 205(g) of the Social Security Act (the "Act"), as amended (42 U.S.C. § 405(g)), to obtain judicial review of a final decision of the Commissioner of Social Security denying his claim for Disability Insurance Benefits ("DIB") under Title II of the Act. The parties have filed cross-motions for judgment, and the administrative record has been certified to the Court for review.

I.  PROCEDURAL HISTORY

Plaintiff protectively filed his application for DIB on December 8, 2011, alleging a disability onset date of August 15, 2011. (Tr. at 22, 156-61.)[1] His claim was denied initially (Tr. at 71-84, 101-04), and that determination was upheld on reconsideration (Tr. at 85-100, 109-12). Thereafter, Plaintiff requested an administrative hearing de novo before an

---

[1] Transcript citations refer to the Administrative Record [Doc. #8].

Administrative Law Judge ("ALJ"). (Tr. at 117-25.) Plaintiff attended the subsequent hearing on October 8, 2013, along with his attorney and an impartial vocational expert. (Tr. at 22.)

The ALJ ultimately concluded that Plaintiff was not disabled within the meaning of the Act. (Tr. at 33.) On May 15, 2015, the Appeals Council denied Plaintiff's request for review of the decision, thereby making the ALJ's conclusion the Commissioner's final decision for purposes of judicial review. (Tr. at 2-8.)

## II.  LEGAL STANDARD

Federal law "authorizes judicial review of the Social Security Commissioner's denial of social security benefits." Hines v. Barnhart, 453 F.3d 559, 561 (4th Cir. 2006). However, "the scope of [the] review of [such an administrative] decision . . . is extremely limited." Frady v. Harris, 646 F.2d 143, 144 (4th Cir. 1981). "The courts are not to try the case de novo." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). Instead, "a reviewing court must uphold the factual findings of the ALJ [underlying the denial of benefits] if they are supported by substantial evidence and were reached through application of the correct legal standard." Hancock v. Astrue, 667 F.3d 470, 472 (4th Cir. 2012) (internal brackets omitted).

"Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1993) (quoting Richardson v. Perales, 402 U.S. 389, 390 (1971)). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (internal citations and quotation marks omitted). "If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is substantial evidence." Hunter, 993 F.2d at 34 (internal quotation marks omitted).

"In reviewing for substantial evidence, the court should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [ALJ]." Mastro, 270 F.3d at 176 (internal brackets and quotation marks omitted). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the ALJ." Hancock, 667 F.3d at 472. "The issue before [the reviewing court], therefore, is not whether [the claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996).

In undertaking this limited review, the Court notes that in administrative proceedings, "[a] claimant for disability benefits bears the burden of proving a disability." Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). In this context, "disability" means the "'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.'" Id. (quoting 42 U.S.C. § 423(d)(1)(A)).[2]

"The Commissioner uses a five-step process to evaluate disability claims." Hancock, 667 F.3d at 472 (citing 20 C.F.R. §§ 404.1520(a)(4); 416.920(a)(4)). "Under this process, the

---

[2] "The Social Security Act comprises two disability benefits programs. The Social Security Disability Insurance Program . . . provides benefits to disabled persons who have contributed to the program while employed. The Supplemental Security Income Program . . . provides benefits to indigent disabled persons. The statutory definitions and the regulations . . . for determining disability governing these two programs are, in all aspects relevant here, substantively identical." Craig, 76 F.3d at 589 n.1 (internal citations omitted).

3

Commissioner asks, in sequence, whether the claimant: (1) worked during the alleged period of disability; (2) had a severe impairment; (3) had an impairment that met or equaled the requirements of a listed impairment; (4) could return to her past relevant work; and (5) if not, could perform any other work in the national economy." Id.

A finding adverse to the claimant at any of several points in this five-step sequence forecloses a disability designation and ends the inquiry. For example, "[t]he first step determines whether the claimant is engaged in 'substantial gainful activity.' If the claimant is working, benefits are denied. The second step determines if the claimant is 'severely' disabled. If not, benefits are denied." Bennett v. Sullivan, 917 F.2d 157, 159 (4th Cir. 1990).

On the other hand, if a claimant carries his or her burden at each of the first two steps, and establishes at step three that the impairment "equals or exceeds in severity one or more of the impairments listed in Appendix I of the regulations," then "the claimant is disabled." Mastro, 270 F.3d at 177. Alternatively, if a claimant clears steps one and two, but falters at step three, i.e., "[i]f a claimant's impairment is not sufficiently severe to equal or exceed a listed impairment, the ALJ must assess the claimant's residual function[al] capacity ('RFC')." Id. at 179.[3] Step four then requires the ALJ to assess whether, based on that RFC, the claimant can

---

[3] "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations." Hines, 453 F.3d at 562 (noting that pursuant to the administrative regulations, the "RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . [which] means 8 hours a day, for 5 days a week, or an equivalent work schedule" (internal emphasis and quotation marks omitted)). The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)." Hall, 658 F.2d at 265. "RFC is to be determined by the ALJ only after [the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (*e.g.*, pain)." Hines, 453 F.3d at 562-63.

4

"perform past relevant work"; if so, the claimant does not qualify as disabled. Id. at 179-80. However, if the claimant establishes an inability to return to prior work, the analysis proceeds to the fifth step, which "requires the Commissioner to prove that a significant number of jobs exist which the claimant could perform, despite [the claimant's] impairments." Hines, 453 F.3d at 563. In making this determination, the ALJ must decide "whether the claimant is able to perform other work considering both [the claimant's RFC] and [the claimant's] vocational capabilities (age, education, and past work experience) to adjust to a new job." Hall, 658 F.2d at 264-65. If, at this step, the Government cannot carry its "evidentiary burden of proving that [the claimant] remains able to work other jobs available in the community," the claimant qualifies as disabled. Hines, 453 F.3d at 567.

III. DISCUSSION

In the present case, the ALJ found that Plaintiff had not engaged in "substantial gainful activity" since his alleged onset date. Plaintiff therefore met his burden at step one of the sequential evaluation process. At step two, the ALJ further determined that Plaintiff suffered from two severe impairments: degenerative disc disease of the lumbar spine and hearing loss (Tr. at 24.) Although Plaintiff also alleged mental impairments, including bipolar disorder, depression, and ADHD, the ALJ did not include any mental impairments at step two. The ALJ found at step three that Plaintiff's degenerative disc disease and hearing loss failed to meet or equal any disability listing. (Tr. at 26.) Therefore, the ALJ assessed Plaintiff's RFC and determined that Plaintiff

> has the residual functional capacity to perform medium exertional work as defined in 20 CFR 404.1567(c) with exceptions. The claimant can occasionally climb ladders, ropes, and scaffolds (due to lumbar disc disease and non-severe obesity). Verbal instructions would be understood best when presented face to

5

> face. The claimant should also avoid concentrated exposure to unprotected heights.

(Tr. at 26-27.) Based on this determination and the testimony of a vocational expert, the ALJ determined at step four of the analysis that Plaintiff could return to his past relevant work as a personnel manager, administrative clerk, rural mail carrier, activity director, and financial institution manager. The ALJ also made an alternative finding at step five that, given Plaintiff's age, education, work experience, and RFC, he could perform other jobs available in the national economy. (Tr. at 31.) Therefore, the ALJ concluded that Plaintiff was not disabled under the Act. (Tr. at 31-32.)

Plaintiff now challenges the ALJ's decision in four respects. He contends that the ALJ erred by (1) "failing to give proper weight to the opinions and reports of [Plaintiff's] treating physicians and psychologist," including with respect to Plaintiff's ADHD, depression, and bipolar disorder (Pl.'s Br. [Doc. #11] at 12), (2) failing to consider all of Plaintiff's severe impairments at step two, including ADHD, depression, and bipolar disorder (Pl.'s Br. at 15), (3) "improperly assessing Plaintiff's credibility, pain[,] and physical and mental limitations" (Pl.'s Br. at 20), and (4) relying upon vocational expert testimony in response to hypotheticals "that were not supported by the record" (Pl.'s Br. at 16). Plaintiff further urges that an immediate award of benefits, rather than remand for a new hearing, constitutes the proper remedy in this case. (Pl.'s Br. at 23.)

After careful review, the Court agrees that substantial evidence fails to support the ALJ's decision not to include any mental impairment at step two of the sequential analysis and the related failure to sufficiently address Plaintiff's mental impairments in the subsequent steps of the sequential analysis. In light of this finding, the Court need not consider the additional

6

issues raised by Plaintiff at this time. Furthermore, as explained below, remand, rather than an award of benefits, is required so that the ALJ, as factfinder, can properly resolve conflicts in the record.

> A. Severe Impairments at Step Two

Plaintiff contends that the ALJ erred in failing to include his mental impairments, including bipolar disorder, depression, and ADHD, among his severe impairments at step two of the sequential analysis. (Pl.'s Br. at 15.)

> Step two is a threshold determination of whether claimants have a severe impairment (or combination of impairments) that meets the twelve-month duration requirement and significantly limits their ability to do basic work activities. 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii) (2010). If the Commissioner finds no severe impairments, the claimant is not disabled and the analysis does not proceed to the other steps. Id. However, if a claimant does have a severe impairment or combination of impairments, the ALJ must consider the effects of both the severe and non-severe impairments at the subsequent steps of the process, including the determination of RFC. See 20 C.F.R. § 404.1523 (2010); SSR 96–8p, 1996 WL 374184, at * 5 (1996); SSR 86–8, 1986 WL 68636, at *5 (1986). If the ALJ proceeds to discuss and consider the non-severe impairment at subsequent steps, there is no prejudice to the claimant. See Thomas v. Commissioner, Soc. Sec. Admin., No. SAG–11–3587, 2013 WL 210626, at *2 (D. Md. Jan. 17, 2013) (finding harmless error where ALJ continued with sequential evaluation process and considered both severe and non-severe impairments); Kenney v. Astrue, No. CBD–10–1506, 2011 WL 5025014, at *5 (D. Md. Oct. 20, 2011) (declining to remand for failure to classify an impairment as severe because it would not change the result).

Rivera v. Astrue, No. CBD-12-1095, 2013 WL 4507081, at *7 (D. Md. Aug. 22, 2013). In other words, "[a]s long as the ALJ determines that the claimant has at least one severe impairment and proceeds to discuss all of the medical evidence, any error regarding failure to list a specific impairment as severe at step two is harmless." McClain v. Colvin, No. 1:12CV1374, 2014 WL 2167832, at *4 (M.D.N.C. May 23, 2014) (citations omitted). Therefore, in considering the alleged error at step two in this case, the Court also considers

7

the ALJ's analysis at subsequent steps in the sequential analysis. Here, however, the ALJ's decision to exclude mental impairments at step two affected the ALJ's analysis of the evidence at subsequent steps, including in the RFC determination, particularly with regard to Plaintiff's problems with concentration, focus, and pace, as further set out below.

The ALJ identified two severe impairments, namely degenerative disc disease of the lumbar spine and hearing loss, at step two of the sequential analysis. (Tr. at 24.) She then categorized the following additional impairments as non-severe: hypertension, allergies, "'possible' obstructive sleep apnea," obesity, bilateral knee osteoarthritis, ADHD, and depression. (Tr. at 24-26.) The ALJ then assessed Plaintiff's RFC, which included no mental limitations. (Tr. at 26-27.)

With regard to Plaintiff's bipolar disorder and depression, at step two the ALJ did not mention bipolar disorder at all, and as to depression, the ALJ stated that "[t]he depression condition was only diagnosed recently in Feb. 2013, and would not meet durational requirements to be considered severe at this time." (Tr. at 25) (ex. citation omitted.) The ALJ also stated that "depression was not noted by a primary care physician until recently on 12-21-2012, . . . . [and] there was no effort to seek mental health treatment until recently, in February 2013." (Tr. at 25.) The ALJ also found that depression was "inconsistent with the wide-ranging activities reported by the claimant's friend" in January 2012, and the "overall evidence of record . . . does not show severe depression symptoms." (Id.)

However, contrary to the ALJ's assertion, the medical records indicate that Plaintiff was diagnosed with depressive disorder as early as November 2008. (Tr. at 374.) The medical records also note a possible diagnosis of bipolar I disorder at that time. (Id.) Plaintiff engaged

8

in psychotherapy treatment evaluation and therapy sessions at Carolina Partners and Chapel Hill Neuropsychology from November 2008 through October 2009, and again in May 2010, and those records also reflect Plaintiff's diagnosis of depression. (Tr. at 409-42). At a consultative examination on March 14, 2012, Plaintiff's symptoms indicated that he was suffering from "depression including social withdrawal" with "suicidal ideation" and "bipolar disorder" including "unpredictable periods of intense rage and frequent mood swings," with a diagnosis of Anxiety Disorder and Depressive Disorder (Tr. at 468, 471). An examination by Dr. Lam on March 23, 2012 likewise noted a diagnosis of depression with "suicidal thoughts." (Tr. at 477-79). Plaintiff's treating primary care physician, Dr. Randolph, noted Plaintiff's depression and/or bipolar disorder during visits on December 21, 2012, February 5, 2013, April 10, 2013, May 29, 2013, and August 2, 2013.[4] (Tr. at 490, 493, 498, 505-10). In addition, medical records from Family Legacy Mental Health Services in February and March 2013 indicate a diagnosis of depression and note an increase in Plaintiff's symptoms after his mother's death in June 2012, including that Plaintiff had purchased a gun as part of his plan to kill several relatives. (Tr. at 516, 530, 539, 544.) Plaintiff was prescribed Lithium at that time. Dr. Randolph provided an opinion on August 2, 2013, stating that Plaintiff is "incapable" of tolerating "even 'low stress' work" due to "Bipolar disorder." (Tr. at 507.)

The ALJ also concluded at step two that Plaintiff's depression was "medically managed and do[es] not result in more than minimal limitations on his ability to engage in work-related activities." (Tr. at 25.) This may be a reference to the treatment of Plaintiff's bipolar disorder

---

[4] The ALJ noted that "at a follow-up exam on 2-5-2013, the claimant reported he has NOT been feeling down, depressed or hopeless in the past month (and then inconsistently alleged he had been 'depressed for about 20 years.'" However, bipolar disorder is marked by alternating periods of mania and depression, and the ALJ did not address the diagnosis of bipolar disorder in considering that evidence.

with Lithium. However, while there is evidence that Lithium was effective in stabilizing Plaintiff's mood, there is also evidence that it was causing tiredness and sedation. For example, Plaintiff testified that the Lithium was working but was causing side effects including tiredness, fatigue, and memory problems. (Tr. at 55-56.) In a May 29, 2013 treatment note, Dr. Randolph noted that "Lithium is causing a lot of sedation and tired[ness]." (Tr. at 509.) In his August 2, 2013 statement, Dr. Randolph noted side effects as: "Bipolar – Lithium – Drowsy" (Tr. at 504), and in his September 17, 2013 opinion letter, Dr. Randolph noted that Plaintiff had been "started on Lithium and so far it has worked well but he tends to be on the sedated side" (Tr. at 550). The ALJ did not address or consider that evidence in concluding that Plaintiff's psychiatric condition was "medically managed" and that Plaintiff was not suffering from any mental impairments at step two.

Moreover, with regard to Plaintiff's learning disability and ADHD diagnosis at step two, the ALJ rejected the possibility that Plaintiff's learning disability or ADHD constituted a severe impairment, based on Plaintiff's college degree and master's degrees and his work history. (Tr. at 25.) The ALJ gave "no weight" to the opinion of Dr. Lynda Johnson that Plaintiff's "reading, math and writing skills are significantly below his aptitude level, which meets the criteria for a learning disability in each area." (Tr. at 25.) The ALJ also concluded that Plaintiff "was only assessed with ADHD one time in an evaluation in August 2011, but was not diagnosed with this condition at more current mental health evaluations . . . . and ADHD was specifically ruled out by treating providers at Carolina Partners." (Tr. at 25.) The ALJ subsequently assigned "great weight" to just one opinion, the state agency consultants' finding that Plaintiff was only mildly limited in terms of concentration, persistence, and pace.

(Tr. at 29.) Notably, in rendering this opinion, the consultants found that "[t]here may be some difficulties with attention and concentration, but this [claimant] has no [history] of ADHD. It is unlikely that someone with ADHD [symptoms] that impair functioning would make it to the [claimant's] age without some level of intervention (most likely in school). Limitations [due to] mental concerns are considered mild in nature." (Tr. at 78, 93.)

However, contrary to the state agency consultant's assertions, Plaintiff appears to have received intervention for some form of mental limitation throughout his education, including placement in resource classes in grades 1 through 12 (Tr. at 279) and placement in college classes for "underprepared" students before being allowed to pursue a four-year degree (Tr. at 282). He then completed his Master of Divinity degree in a "Limited Program" provided for "certain students with academic or other difficulties," in which he took fewer classes per semester spread out over six years (Tr. at 281), and earned his Master of Public Administration under "Special Student Status," allowing him to take a limited number of credit hours, and placing him under "Conditional Admission" status until he obtained a GPA of 3.0 or better (Tr. at 280). It also appears that Plaintiff took eight years to complete his MPA. (Id.)

In addition, ADHD was not "specifically ruled out by treating providers at Carolina Partners" as the ALJ suggests,[5] nor was it "only 'by history' presented by the claimant" as implied by the state agency consultants. (See Tr. at 25, 78, 93.) In fact, as Plaintiff correctly notes, ADHD appears as a diagnosis throughout Plaintiff's treatment notes from Carolina

---

[5] The ALJ mistakenly infers that "r/o," short for "rule out," indicates that a potential diagnosis has been ruled out. In fact, a clinician typically places r/o before a diagnosis to indicate that she is fairly certain of a diagnosis, but that more assessment is needed. The terms provisional or deferred may also be used. See Nicholson ex rel. E.R.N. v. Astrue, No. WDQ-11-69, 2012 WL 959375, at *5 n.5 (D. Md. Mar. 20, 2012) ("[A] rule out ('R/O') diagnosis is not a firm diagnosis, but something that needs to be looked at").

Partners, where he saw Jenny Tart, a Licensed Professional Counselor, on an ongoing basis. (See Tr. at 414, 418, 431, 432, 433, 439, 441, 584.) Lynda G. Johnson, Ph.D. confirmed Plaintiff's ADHD diagnosis through neuropsychological testing in December 2008 (Tr. at 551-55), and again in 2011 (Tr. at 444-48), and thereafter Plaintiff was prescribed Concerta and later Adderall (see Tr. at 413, 431, 433, 440, 569, 571). Nothing in the record indicates that the state agency consultants or the ALJ took into consideration the above evidence relating to Plaintiff's educational accommodations or treatment for ADHD when discounting his alleged mental difficulties. In fact, the decision makers explicitly relied on the *lack* of such evidence in classifying Plaintiff's concentration limitations as "mild" and his mental impairments as "non-severe" at step two of the sequential analysis.

Thus, the Court is left with a situation in which Plaintiff's medical records reflect an ongoing diagnosis of depression and bipolar disorder, treated with Lithium and Trazadone, and a diagnosis of ADHD based on neuropsychological testing and a history of accommodations in school, including in college and graduate school, for a learning disability. Yet no mental impairments were included at step two. In considering Plaintiff's impairments at step two, the ALJ did not consider Plaintiff's bipolar disorder at all, rejected Plaintiff's depression because it did not meet the duration requirement based on an inaccurate assessment of the records, and rejected Plaintiff's diagnosed ADHD and learning disability based on Plaintiff's education and work history even though school records demonstrate accommodation for the learning disability.[6] Finally, the ALJ ultimately rejected any mental

---

[6] With respect to Plaintiff's work history, Plaintiff had worked most recently with the Department of Veteran's Affairs, but he was terminated from that position in 2011 after the VA denied his request for a change in work schedule or performance standards, which he requested to accommodate his alleged mental impairments. The United States Office of Personnel Management ultimately found Plaintiff disabled from his position at the VA

12

disorder as being sufficiently "medically managed," without consideration of the side effects of the medication.

The question then becomes whether the ALJ nevertheless sufficiently addressed Plaintiff's alleged mental impairments later in the process, or whether the ALJ's failure to include Plaintiff's mental impairments at step two is otherwise harmless. In this regard, Defendant takes the position that "plaintiff has not identified any specific functional limitations resulting from [this] impairment that could be included in the RFC assessment" and that "the record does not demonstrate any functional limitations apart from those already included in the RFC assessment." (Def. Br. [Doc. #15] at 5, 6.) However, Plaintiff contends that his mental impairments affect his concentration, focus, and pace. At the hearing, when asked why he could no longer work at his past positions, Plaintiff responded, "I have problems focusing and concentrating." (Tr. at 51.) Plaintiff described how it would take several hours to get ready or to drive somewhere because he had trouble making decisions and he "skips time in space." (Tr. at 52.) Plaintiff also noted his tiredness, fatigue, lack of energy, and memory problems, which he attributed to his depression and bipolar disorder and the side effects from Lithium and Trazadone. (Tr. at 53-56.) Plaintiff presented the opinion of Dr. Johnson, who conducted a neuropsychological evaluation in July and August 2011 and concluded that Plaintiff was currently functioning in the average range of intelligence with

---

due to "attention deficit hyperactivity disorder, depression and degenerative disc disease." (Tr. at 15.) The Appeals Council did not consider that determination in this case because it was "about a later time," apparently because the OPM determination was dated June 16, 2014, six months after the ALJ's decision in this case. (Tr. at 3, 15). Given the timing, and the fact that the OPM disability determination was for the position that Plaintiff was terminated from in 2011, it is not clear that the OPM determination relates to a different time period. The Court need not consider that issue further, since any further analysis of these issues can be undertaken on remand.

13

average verbal abilities, but with ADHD and cognitive deficits particularly as to memory. (Tr. at 448.) Dr. Johnson opined that as a result of his ADHD/learning disability, Plaintiff required additional time to complete written assignments, repetition in order to learn new information in a work setting, and written instruction to help address memory problems. (Tr. at 448.) Dr. Johnson noted, for example, that Plaintiff was able to improve his reading comprehension score if he was given 40 minutes, rather than 15 minutes, to complete the test. (Tr. at 447.) Seven months later on March 14, 2012, Dr. April Harris-Britt conducted a Comprehensive Clinical Psychological Evaluation for Disability Determination Services, and based on her testing, she noted that Plaintiff's "memory for recent and remote events was fair" and "his working memory appeared impaired." (Tr. at 470.) Dr. Harris-Britt concluded that his impairments did not appear to prevent him from understanding and following instructions and performing simple, routine, repetitive tasks, but that "[h]e is likely to exhibit some difficulties maintaining concentration, persistence and pace." (Tr. at 471-72.) Finally, Plaintiff's treating physician, Dr. Randolph, provided an August 2, 2013, opinion concluding that as a result of bipolar disorder, Plaintiff was "[i]ncapable of even 'low stress' work" and that "[b]ipolar disease with flare ups along with arthritis and side effects of medications would cause the most problems" for employment. (Tr. at 507.) Dr. Randolph also provided a letter dated September 17, 2013, opining that due to Bipolar Disorder, Plaintiff has "struggled over the years with various mood swings" and "[h]is ability to stay alert and focus has caused an inability to successfully complete a 40 hour work week." (Tr. at 550.) Dr. Randolph noted that the Lithium "worked well but [Plaintiff] tends to be on the sedated side," and that "[d]ue

14

to the physical limitations and the mental issues, . . . [Plaintiff] would have a difficult time to maintain the requirements for successful employment." (Id.)[7]

With respect to Plaintiff's contentions regarding his difficulties concentrating, the ALJ determined at step two that Plaintiff had only mild limitations in concentration, persistence, or pace. In doing so, she found that although Plaintiff "alleges difficulty concentrating, he provided a very detailed description at the hearing about all of his previous jobs. He is able to concentrate to drive without difficulty or becoming lost. He is able to shop independently and handle his own finances." (Tr. at 26.)[8] Similarly, in assessing Plaintiff's RFC, the ALJ noted that Plaintiff alleged that "he would be unable to return to any of his past jobs due to difficulty concentrating – after he had just finished providing a detailed 10 minute description

---

[7] Plaintiff provided evidence that he was determined to be eligible for Vocational Rehabilitation Services because of specific impediments to employment, including "cannot complete many written work assignments in the usual time allotted; cannot learn complex new work information without substantial repetition; grade school achievement levels in math calculations, writing mechanics, and writing composition, indicating difficulty in completing tasks in these areas that require higher achievement levels; low level of energy and motivation available to find work and work on tasks; decreased ability to tolerate workplace stresses; decreased ability to concentrate on work tasks." (Tr. at 10.) The Appeals Council did not include that determination in the record because it was dated three months after the ALJ's decision in this case, and the Court need not consider that determination, as the Court simply notes these examples of the types of functional limitations Plaintiff alleged.

[8] The ALJ relied on Plaintiff's third-party function report regarding Plaintiff's daily activities to note that Plaintiff "is able to prepare his own meals for several hours, can do basic cleaning/laundry/household tasks for 3-4 hours, as well as mow the lawn at least weekly, can drive a car, go out by himself, shop in stores for food several hours a week, pay bills, count change, handle a savings account, use a checkbook, [and] watch television every day." (Tr. at 29-30.) However, the ALJ declined to consider the same third-party report to the extent it noted that Plaintiff had difficulty with focus and was unable to complete tasks that require concentration, that he could only concentrate for "10-15 mins" at a time, and that Plaintiff purchased prepared food but it takes "several hours", that regular chores take 3-4 hours, and that it takes him "about [a] week to do yard work and [a] week or more to clean his room, etc." (Tr. at 222-26.) As noted above, Plaintiff's contention with respect to his mental impairments is not that he is unable to do these activities, but that they take additional time due to his difficulties with concentration, persistence, and pace, as specifically reflected in the third-party function report.

about what he did at each of these past jobs." (Tr. at 29.)[9] In assessing Plaintiff's RFC, the ALJ also considered the opinion testimony of Dr. Randolph and Dr. Harris-Britt, but assigned "little weight" to Dr. Harris-Britt's opinion that Plaintiff "is likely to exhibit some difficulties maintaining concentration, persistence, and pace," as the ALJ found this opinion inconsistent with "findings that [Plaintiff] has average cognitive abilities and average intellectual ability," and inconsistent with Plaintiff's "performance at the consultative examination on March 14, 2012." (Tr. at 30.) The ALJ similarly assigned Dr. Randolph's opinion "little weight," finding that Dr. Randolph's assessment was "quite inconsistent with the physical and mental treatment records . . . [and] the Third Party report of activities." (Tr. at 31.)

In considering this issue, the Court notes that it is not clear how the opinion of Dr. Randolph is inconsistent with the record, or how the opinion of Dr. Harris-Britt is inconsistent with the consultative examination. Moreover, it appears that the ALJ relied on her own lay evaluation of Plaintiff at the hearing to discount the medical evidence regarding Plaintiff's mental impairments. Finally, it appears that the ALJ continued to rely on the same faulty bases that were relied upon in concluding that there were no mental impairments at step two. Thus, Plaintiff has identified specific functional limitations that were not included in the RFC, and the ALJ's failure to include Plaintiff's mental impairments at step two was not remedied by the ALJ's analysis at later steps of the sequential evaluation.

---

[9] The Court notes that it is not clear from the transcript when this occurred. Plaintiff started answering a question from the ALJ regarding his employment with the VA, but could not recall the name of the program and then digressed into a discussion of his illnesses. (Tr. at 47.) The ALJ interrupted him and then stated that she would "take notice of the claimant's work background." The ALJ then provided a summary of the work background to the Vocational Expert and asked Plaintiff limited questions as the ALJ summarized the work history. (Tr. at 44-50.) Based on the transcript, it does not appear that Plaintiff provided a detailed 10 minute description of what he did in each job.

16

This omission is particularly significant in light of the Fourth Circuit's decision in Mascio v. Colvin, 780 F.3d 632, 638 (4th Cir. 2015), which addressed, among other issues, whether and how limitations in concentration, persistence, and pace found at step two must be accounted for in the RFC assessment. Because the record contains significant evidence of concentration difficulties which was not adequately addressed at any level of administrative review, substantial evidence fails to support the ALJ's decision in the present case.

The Court also notes Defendant's alternative contention, that even if Plaintiff were limited to simple, routine, repetitive tasks in a low-stress job, he would still be able to perform other work. (Def. Br. at 13.) The Court has considered this issue, particularly with respect to whether remand is actually necessary in this case. However, it is beyond the scope of this Court's review to determine what limitations would have been included in the RFC, if any, in order to address Plaintiff's difficulties in concentration, focus, and pace, let alone to then attempt to determine whether jobs exist in the national economy that would still be consistent with those limitations and the remainder of the RFC. It may well be that Plaintiff is still able to perform other work in the national economy even if his mental impairments are fairly considered, but that determination must be made by the ALJ in the first instance, taking into account all of the relevant evidence.

B.   Reversal as a remedy

As a final matter, Plaintiff requests that the Court "reverse the ALJ's decision and replace it with a finding that [Plaintiff] is in fact disabled and entitled to benefits." (Pl.'s Br. at 23.) Plaintiff is correct that, under sentence four of 42 U.S.C. § 405(g), a reviewing court may affirm, modify, or reverse an ALJ's ruling "with or without remanding the cause for a

17

Case 1:15-cv-00588-TDS-JEP   Document 18   Filed 11/02/16   Page 17 of 18

rehearing" upon deciding that the ALJ's decision is not supported by substantial evidence. However,

> [a] necessary predicate to engaging in substantial evidence review is a record of the basis for the ALJ's ruling. See Gordon v. Schweiker, 725 F.2d 231, 235 (4th Cir. 1984). The record should include a discussion of which evidence the ALJ found credible and why, and specific application of the pertinent legal requirements to the record evidence. Hines v. Bowen, 872 F.2d 56, 59 (4th Cir. 1989). If the reviewing court has no way of evaluating the basis for the ALJ's decision, then "the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." Florida Power & Light Co. v. Lorion, 470 U.S. 729, 744, 105 S.Ct. 1598, 84 L.Ed.2d 643 (1985).

Radford v. Colvin, 734 F.3d 288, 295 (4th Cir. 2013).

In the present case, as set out above, the ALJ's failure to properly evaluate the evidence serves as the very basis for reversal. Accordingly, remand, rather than award of benefits, constitutes the proper remedy so that the ALJ may resolve the remaining factual issues.

IT IS THEREFORE RECOMMENDED that the Commissioner's decision finding no disability be REVERSED, and that the matter be REMANDED to the Commissioner under sentence four of 42 U.S.C. § 405(g). The Commissioner should be directed to remand the matter to the ALJ for further consideration of Plaintiff's claims in light of the above recommendation. Defendant's Motion for Judgment on the Pleadings [Doc. #14] should be DENIED, and Plaintiff's Motion for Judgment on the Pleadings [Doc. #10] should be GRANTED to the extent set out herein.

This, the 2nd day of November, 2016.

                                                       /s/ Joi Elizabeth Peake
                                                 United States Magistrate Judge